MEMORANDUM OF DECISION
On May 19, 2000, the Department of Children and Families, hereafter DCF, filed a petition for the termination of the parental rights of Janet H. and the then identified putative father, Jeffrey O., to Eric H. Some seven months later, a second termination petition was filed on December 7, 2000, seeking to terminate the parental rights of Janet H. and Christopher L. to Janet's second child, Corey L. On January 17, 2001, Christopher L. consented to the termination of his parental rights. His consent was accepted by the court as knowingly and voluntarily made with CT Page 7742 the advice and assistance of competent counsel. (Brenneman, J.) The petition was amended to reflect his consent.
The initial termination petition was amended effective on that date to allege that Janet had abandoned Eric and that she had no ongoing parent-child relationship with him. The original termination ground alleging that Janet had failed to rehabilitate, so that she could parent Eric, remained in place. Because of the uncertainty as to Erik's paternity and because eight separate individuals whom Janet had identified had been excluded by paternity testing, the petition was amended to name a John Doe as Eric's father and to add the same three grounds against him as had been alleged against Janet. Connecticut General Statutes §17a-112(j)(3)(A), (B) and (D). Both petitions further allege that the parents are unable or unwilling to benefit from reunification efforts.
The petitions were consolidated for trial, which began on April 17, 2001 and continued to April 18, 2001 and concluded on April 19, 2001. No parent other than Janet attended the trial. Janet, through her counsel, vigorously contested the petitions. During closing arguments, she conceded that DCF had proven by clear and convincing evidence that it had made reasonable efforts to reunite her with Eric and that there was no ongoing parent child relationship between them. However, she made no concessions concerning DCF's petition to terminate her rights to Corey and asserted that he should be returned to her. Due to the facts found and for the reasons set forth below, the court grants the termination petitions for the parental tights of Janet H., John Doe and Christopher L.
From the evidence presented, the court finds the following facts:
 A. FACTS B. 1. The mother, Janet H.
Janet is now twenty-three years old. She had a turbulent childhood with two psychiatric hospitalizations while still a minor. She was removed from her parents' care and became a DCF foster child at the age of three and later at the age of five when her mother died. Her medical and psychiatric difficulties began in early childhood. Due to her mental health difficulties, shortly after she came into DCF care the second time, she was placed, in a residential home where she remained for two and a half years. She also suffered from seizures as a child. After seven years in foster care during which time she was apparently the victim of physical and emotional abuse, she was returned to the care of her father. CT Page 7743 While in foster care, she had been treated with Ritalin for her Attention Deficit Disorder, which treatment ended when she was returned to her father. After some time with him, she came to live with her grandmother, and had a difficult adolescence. She has never been employed and receives social security income.
When Janet was hospitalized during Eric's birth on June 1998, the staff at the hospital contacted DCF as Janet did not appear to be fully rational or accurately reporting events in her life. The DCF investigator at that time testified at trial that Janet "was not very responsive and it was apparent that she had no real ability to defer her own gratification and put her child's interests first." DFC concluded that such behavior would place the infant at risk. In addition, her living situation with an older man and his sixteen-year-old son, Christopher L., who became the father of her second child, in a tiny apartment worried DC. The investigator reported that the these individuals, both of whom had a criminal history, appeared "to be taking advantage of her." Janet herself had a criminal history with arrests for two counts of harassment involving stalking.[2] She also had not adhered to her required mental health treatment as well as her medication regimen.
Eric H. never was released from the hospital into Janet's care, but came into foster care directly from the hospital. He was removed from her by an order of temporary custody, entered by the court on July 28, 1998 (Walsh, J.). A neglect petition was also filed at that time, alleging that Eric was neglected because he was denied proper care and attention and was permitted to live under conditions, circumstances or associations injurious to his well being. On September 2, 1998, the court (Swienton, J.) found that Eric was an uncared-for child because his specialized needs could not be met in the home. Eric was committed to DCF on that date; subsequent commitments were extended on September 1, 1999 and July 26, 2000. Eric's current commitment is due to expire on September 2, 2001.
Corey L. was born to Janet on July 1999. Janet's personal situation had not improved from the previous year, at the time of Eric's birth. She still resided with the two individuals with whom she had previously been living. She had not participated adequately in mental health treatment and did not believe she needed professional help. She had not followed the expectations set for her by the court in the pending neglect petition concerning Eric.
Corey also did not leave the hospital in Janet's care. On July 21, 1999, DCF filed an application for temporary custody of Corey as well as a neglect petition. The ex-parte order was granted on that date and sustained after hearing on July 28, 1999. The petition alleged that Corey CT Page 7744 was neglected in that he was denied proper care and attention by his mother, and that he was permitted to live under conditions, circumstances or associations injurious to his well being. On December 15, 1999, the court granted DCF's motion to amend the neglect petition to add the grounds that the child was uncared-for and had specialized needs. On September 20, 2000, after a fully contested hearing, the court (Trombley, J.) adjudicated Corey on both grounds and found that he had been neglected and was an uncared-for child with specialized needs.
Dr. Stephen Herman, an experienced forensic and clinical psychologist specializing in child and adolescent psychology, testified on behalf of DCF. Dr. Herman performed several court-ordered psychological evaluations of Janet in 1998, 1999, 2000 and 2001. The results of the evaluations revealed that Janet was and is in need of chronic and continuous treatment for a personality disorder. Dr. Herman diagnosed Janet as having a borderline personality disorder with the possibility of the added diagnosis of antisocial personality disorder.[3]
Dr. Herman explained these diagnoses as chronic, enduring patterns of behaviors, cognition and affects marked by instability and fragility. A person with a personality disorder does not have a firm centered self, but rather, has an unstable self and unstable moods. Such a person suffers from a lack of insight, engages in risk-taking behaviors, denies the existence of a problem and is resistant to support and assistance. When asked whether such a diagnosis may affect parenting ability, Dr. Herman testified that the diagnosis has a "direct bearing on Janet's ability to safely and adequately parent both of her children." Dr. Herman explained that the characteristics of a personality disorder all go to parenting ability and the ability to provide ongoing daily nurturing to children.
Dr. Herman was optimistic about Janet in his 1998 evaluation and made specific recommendations to fashion a reunification plan for her. His recommendations were designed to provide Janet with an opportunity to demonstrate progress in her mental health treatment and her ability to safely parent her child. Unfortunately, in 1999 Dr. Herman found that Janet had not complied with the 1998 recommendations. She had not gained insight into her need for services and mental health treatment. Janet reported at that time that she had no need for psychiatric treatment and intended to stop her therapy sessions. Dr. Herman concluded that because Janet had not demonstrated insight into her limitations nor taken responsibility for her problems, that she could not safely or appropriately parent her children.
In Dr. Herman's 2000 evaluation, he indicated that Janet's psychological status was essentially unchanged from the previous year. He stated: CT Page 7745
 "She has absolutely no insight into her condition, the impact she has on those around her, the poor choices she makes for herself, and how these choices can have a direct and deleterious impact on her children. She avoids and refuses psychiatric help and displays no willingness to seek or remain in treatment."
Further, he observed that:
 "Janet is too psychiatrically and cognitively impaired to parent Eric. Her psychiatric status magnifies her cognitive impairments. Her Borderline Personality Disorder — not automatically a bar to parenting in an individual — would directly put this child at grave risk for physical abuse and emotional neglect, were he returned to her care. She is quick to anger, she could engage in a series of unstable "romantic' relationships with men who might also put Eric at risk, she has inappropriate expectations for what this child ought to be doing and saying, and she has absolutely no insight into any of the above. She will not seek psychiatric treatment for herself and will fail to recognize if and when her child needs it as well."
As to Janet's ability to parent Corey, Dr. Herman in his 2001 report, although noting that "the parent-child interaction with Corey was normal and appropriate," concluded that the overwhelming evidence points against Janet being able to provide safe and "good enough" parenting to Corey.
Robin Hawley, a licensed clinical social worker employed by Northwest Center for Family Service and Mental Health, testified as to Janet's diagnosis of Borderline Personality Disorder. Her testimony concurred with Dr. Herman's evaluations. Ms. Hawley testified that this diagnosis has an impact on daily functioning. Individuals with this diagnoses are typically unstable in their interpersonal relationships; their mood and sense of self is unstable; they are reactive to others and have difficulty in modulating their behavior and controlling their anger. Janet demonstrated all of these characteristics.
DCF also referred Janet to Catholic Family Services, Northwest Mental Health Authority, Charlotte Hungerford Hospital, Brooker Memorial, Susan B. Anthony, Healthy Start and the McCall Foundation in an effort to provide case management, psychiatric services, housing services, money management, individual counseling, parenting classes, one-on-one CT Page 7746 parenting instruction, domestic violence services and individual anger management classes, each geared to her special needs. The clear and convincing evidence introduced at the that demonstrated that Janet consistently refused to participate in the services offered to her, telling providers that she did not have a problem and did not need therapy. DCF made many efforts to assist Janet in rehabilitating herself so that she could be reunified with her children.
Many of the services were provided to Janet to enable her to complete the expectations as well as the specific steps that had been ordered by the court, both in Eric's case as well as in Corey's case. The crucial steps issued by the court in Eric's case required Janet to "continue counseling with Kim Christopher at Behavioral Center for Youth and Families" and for her "not to permit any guests while Eric is present unless approved by DCF."[4] Visits had been permitted in Janet's home for a period of time and ceased in November, 1999, when they took place either in the DCF office or at a play group the children attended. In a letter to Janet from Mary Howard, the DCF social worker, Ms. Howard informed Janet that:
 "There are indications that there is another occupant in your home during visits. I received several disturbing telephone calls from you on my voice machine after the unannounced visit. These messages are very upsetting and of a threatening nature. When I spoke to you on the phone after receiving the many messages you left, you accused the social service aide of stealing from you. . . ."[5]
The specific steps issued in Corey's case required Janet to participate in parenting and individual counseling[6] as well as to make progress toward the identified treatment goals, none of which she was able to accomplish. While she attended three separate parenting education classes in 1998 and 1999[7], she never demonstrated much increased understanding in parenting techniques. Her persistent and ongoing mental health issues, for which she had refused treatment, have stood in her way of making any significant strides in improving her parenting abilities.[8]
The DCF social worker, case aide and supervisor also testified indicating their concerns regarding Janet's ability to safely parent the children as well as her lack of understanding as to how her behaviors and mental health issues impacted her parenting. Evelyn B., Janet's case aide for six years, described a visit where Janet had placed Eric into a stroller and then attempted to go over some steps. As Janet went forward and Eric almost fell, Janet froze and was unable to do anything to CT Page 7747 protect him. In another instance, Eric was choking, again Janet froze and the case aide had to help her.
Sherry Hayward, the DCF worker since November, 1999, testified that although numerous efforts were made to enable Janet to be in a position to safely parent the children, she could not do so. Janet's lack of understanding of child development and her inappropriate age expectations of the children made it impossible for Janet to parent them safely.
2. The unknown and absent father, John Doe.
Janet has identified many potential individuals as the biological father of Eric, including the father of Corey. In all, eight individuals were excluded as the biological father through paternity testing. John Doe could not be so tested. No individual has claimed to be the father of Eric nor been involved in any way in his life. John Doe has abandoned this child and does not have an ongoing parent-child relationship with him. Services were not possible for him as he was not involved with DCF. From the clear and convincing evidence, the court finds that the John Doe has abandoned this child, has not rehabilitated so that he could parent him and has no ongoing parent-child relationship with him.
3. The Children
Eric and Corey were both placed in the same foster home together, each of them at birth. Eric is now two years and eleven months old. He will be three on July 2001. He is attached to his foster family and very connected to his brother, Corey. He has had no developmental difficulties and an evaluation by the "Birth to Three" program shows that he is above average in some areas. He has experienced some persistent medical difficulties with his upper respiratory system, for which the foster parents and his pediatrician have provided care.
Corey is one year and eleven months old and will be two on July 2001. He, too, has done well in his present foster home and is attached to his foster parents as well as his older brother. He is a more difficult child to parent than Eric. Nonetheless, the present foster parents wish to adopt Eric and Corey, should they become free for adoption.
 B. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court CT Page 7748 finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . ." Connecticut General Statutes § 17a-112(j)(1). The petitions allege that Janet and John Doe are unwilling or unable to benefit from reunification services. The court finds, from the clear and convincing evidence, that Janet has been unable to benefit from reunification services, despite the many reasonable efforts that DCF has made to assist her to rehabilitate. As to John Doe, he never came forward to claim Eric as his child and as such has been both unwilling and unable to benefit from reunification services. Corey's father has consented to the termination of his parental rights.
2. Adjudicatory findings
A. Janet H.
The termination petitions allege that Janet has failed to rehabilitate, so that she could parent her children, who were adjudicated uncared-for children in prior proceedings. Connecticut General Statutes § 17a-112(j)(3)(B). "`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986), see also; In re Juvenile Appeal, 1 Conn. App. 463,477, 473 A.2d 795 (1984). Janet has been unable to deal with her mental health difficulties, which prevent her from being able to parent her children safely. She has not been able, despite significant, continuing and appropriate services, to make any progress toward rehabilitation.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722 (1989), In reHector L., 53 Conn. App. 359, 366-367, 730 A.2d 106 (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Janet's conduct prior to the filing of the petition, but also her conduct since that time. In this case, this was a period of just over one year, during which time there has been no change. The court finds, from the clear and convincing evidence, that not only has Janet been unable to rehabilitate herself, but also, given the age and needs of her children, she will be unable to do so in the reasonably foreseeable future. The court finds that her past consistent failure to do so is a reasonable predictor of what the future will hold for Janet. Allowing the children to remain in foster care for years to come with no hope that Janet will improve will not meet their needs for permanency and a safe, secure and stable future. CT Page 7749
The petition seeking termination of Janet's rights to Eric also alleges that Janet has abandoned him and that she has no ongoing parent-child relationship with him. As previously noted, Janet conceded the last allegation at the close of trial and the court so finds from the clear and convincing evidence.
On the issue of abandonment, the court finds from the clear and convincing evidence that Janet has abandoned Eric within the legal meaning of that term. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11,14, 438 A.2d 801 (1981). Abandonment focuses on the parent's conduct. Inre Michael M., 29 Conn. App. 112, 614 A.2d 832 (1992); In re Rayna M.,13 Conn. App. 23, 36, 534 A.2d 897 (1987); In re Kezia M.,33 Conn. App. 12, 632 A.2d 1122 (1993). Janet has not demonstrated a consistent interest and concern for Eric. She has treated her two children differently and very demonstrably prefers Corey over Eric. In terms of parenting children, such a rejection of one in preference to the other is a form of abandonment, since consistent treatment of Eric in this fashion, were he in her care, would seriously damage him.
B. The allegations against John Doe.
The petition as it relates to John Doe alleges that he abandoned Eric, that he has failed to rehabilitate so that he could parent him, and that he has no ongoing parent-child relationship with him. The court finds, from the clear and convincing evidence, that all three grounds have been proven by the ongoing absence of this biological parent in Eric's life.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112(k), noting that none are required for Christopher L. as to Corey, as he has consented to the termination of his parental rights.
1) Appropriate and timely services were provided by DCF to the family. These include services to benefit the children, many referrals for Janet to deal with issues of personal counseling, parenting, substance abuse treatment and anger management treatment. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence, reasonable reunification efforts were made by DCF for Janet and that she was unable to benefit from them. None were made for John Doe as CT Page 7750 he was never available to receive such services.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations as well as specific steps were set for Janet in the earlier neglect proceedings. She was never able to fulfill the most crucial of these and was not able to rehabilitate, so that she could be reunified with her children. None were set for John Doe, as he never participated in any proceedings.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. The court has detailed that both of the children are doing well in their foster home and are attached to their foster family. They also share a significant bond with each other. Each has resided with their present foster family for his entire short life. Testimony revealed that each would be harmed if separated from their foster family and each other. Their feelings and ties to their biological mother are not strong. Eric has no feelings or ties to his unknown father.
5) Finding regarding the ages of the children: Eric is two years and almost eleven months old and Corey is one year and almost eleven months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the children to return them to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the children as part of an effort to reunite the children with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the children. As detailed above, the court finds that Janet has not made the necessary changes in her life to care for either of these children. John Doe has been absent from Eric's life.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parents. There is no such conduct. DCF took steps for a number of years to assist this family. They offered many services to Janet, renewing their efforts when she was discharged periodically from one mental health counselor to secure others for her. CT Page 7751
D. DISPOSITION
 E.
In hearing a termination of parental rights case, the court must first determine whether or not the grounds for termination have been proven by clear and convincing evidence. If so, or not the grounds for termination have been proven by clear and convincing evidence. If so, only then may it consider what action is in the best interests of the child at issue.
 "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citations omitted; internal quotation marks omitted.) In re Danuael D., 51 Conn. App. 829, 835-37, 724 A.2d 546
(1999).
The court has found that the grounds alleged against the biological parents of these two children have been proven by clear and convincing evidence. Corey's father has consented to the termination of his parental rights. The court has made the seven statutory findings required, which all weigh in favor of termination being in these children's best interests. The court concludes, from the clear and convincing evidence that they cannot wait any longer for permanency. Further, our courts have noted the deleterious effect of prolonged temporary care of abused and neglected children. In re Juvenile Appeal (84-CD), 189 Conn. 276,455 A.2d 1313 (1983). In addition, [b]cause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V., 25 Conn. App. 741, 748, 596 A.2d 930
(1992).
The court concludes, from the clear and convincing testimony, that it is in the best interests of Eric and Corey to have permanency and stability in their lives. Accordingly, the court further finds by clear and convincing evidence that it is in their best interests that their parents' rights to them be terminated.
The court therefore orders that a termination of parental rights enter CT Page 7752 terminating the parental rights of Janet H., John Doe and Christopher L. The children's foster family has expressed a desire to adopt the children in their care. The court directs that they be given first consideration in any adoption, as is presently the DCF plan for these children. The court appoints the Commissioner of the Department of Children and Families as the statutory parent. The court further orders that a permanency plan for Eric and Corey and a review plan for them be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session